**Kenneth R. RICHARDSON, Appellant,**

v.

**Ann L. RICHARDSON, Appellee.**

Superior Court of Pennsylvania.

Argued Jan. 9, 2001.

Filed May 3, 2001.

Edward G. Conroy, West Chester, for appellant.

Patricia T. Brennan, West Chester, for appellee.

Before STEVENS, MONTEMURO * and BECK, JJ.

BECK, J.:

¶ 1 This appeal arises from contempt proceedings following the 1996 bifurcated divorce, in Chester County,[1] of appellant Kenneth Richardson and appellee Ann L. Richardson.[2] The parties married in 1975 and separated in 1994. They are the parents of one emancipated child, born in 1978. Husband-appellant remarried shortly after the divorce.

¶ 2 A special master held a hearing on economic issues and issued a recommendation in May, 1997. In an order of May 20, 1997, the court adopted the master's recommendations concerning the division of real estate, retirement accounts, automobiles, a trailer, a boat, household furnishings, bank accounts and cash. That part of the order is not in issue in this appeal.

The court's order for equitable distribution also awarded wife-appellee sixty per cent of husband-appellant's DuPont Savings and Investment Plan (SIP); sixty per cent of that part of appellant's pension from DuPont that had been acquired during the marriage, three years coverage of medical insurance, plus $2,750 per month in alimony for an indefinite period, modifiable and terminable upon a substantial change in circumstances. The SIP division and the award of part of the pension required the court to issue a qualified domestic relations order (QDRO),[3] which had not yet been signed by husband-appellant at the time this appeal was filed. Husband-appellant did not appeal the order of May 20, 1997.

¶ 3 Due to husband-appellant's general lack of compliance, including dispute over the disposition of marital real property, wife-appellee filed a petition for civil contempt and special relief on August 5, 1997. In a subsequent petition, filed September 16, 1997, she stated that she had information that appellant was about to leave his employment at DuPont, and would receive a "buy-out" in lieu of pension benefits. Wife-appellee asked the court to freeze husband-appellant's SIP and pension funds until he complied with the order for him to sign the QDROs.

¶ 4 Husband-appellant did leave his employment at DuPont in September, 1997. He paid alimony until the beginning of 1998. He paid for appellee's medical insurance until late 1997, when the coverage lapsed. By an order dated December 22,

---

* Retired justice assigned to Superior Court.

1. Wife-appellee now lives in Virginia.

2. Ordinarily, an adjudication of contempt, with a directive to specifically perform, without sanctions, is interlocutory and not appealable. *Sonder v. Sonder*, 378 Pa.Super. 474, 549 A.2d 155 (1988). In this case, however, the contempt proceeding resulted in the award of appellant's pension to appellee, and is therefore appealable.

3. Term as used in the Retirement Equity Act of 1984, P.L. 98–397 and defined in ERISA, 206(d)(3)(B)(I) and 414(P)(1)(A) of the Internal Revenue Code.

1997 the court[1] required the parties to proceed with the equitable distribution as it had been determined, and to make final and sign, within thirty days, the QDROs as they applied to the distribution of husband-appellant's SIP and pension funds.

¶ 5 Wife-appellee subsequently brought another petition for contempt and enforcement of the May 20, 1997 and December 22, 1997 orders. Husband-appellant's lawyer responded by asserting his inability to pay because of involuntary termination of employment by DuPont, and his inability to request an amendment of the court's alimony order because he had been living out of the country since 1997. Following a hearing on August 9, 1999, the court found husband-appellant in willful contempt and issued a bench warrant for his arrest, sentencing him to six months in prison or until such time as he paid his arrearages in alimony and complied with the orders relating to the QDROs. The court also ordered him to pay wife-appellee's medical expenses in the amount of $16,000, and counsel fees in the amount of $2200.

¶ 6 Because of husband-appellant's failure to comply, the matter was relisted for another contempt hearing on May 17, 2000. On May 22, 2000 the court[5] directed that wife-appellee should receive 100% of the present value of appellant's DuPont retirement pension,[6] provided the sum did not exceed $243, 467.23. To the extent the present value of the pension was less than $243,467.23, the difference between its value as of the date of implementation and that sum was to be entered as a judgment against appellant. The court ordered him to sign the QDRO within ten days of its receipt, and if he did not sign, the court directed the prothonotary of Chester

County to sign it on behalf of husband. Husband-appellant appeals from this order.

## The pension allocation

 ¶ 7 Husband-appellant's position is that his pension from DuPont, a qualified plan, cannot be attached in favor of his former wife beyond what was earned during the marriage. Appellant cites *Hollman v. Hollman,* 515 Pa. 288, 528 A.2d 146 (1987), where the Court allowed attachment of a pension after a divorce following twenty-nine years of marriage, and the bulk of the pension was earned during the marriage. The rationale for the decision is that pensions are for the benefit of a participant's family, and the money placed in the pension fund is money that the family defers spending until a later time. Therefore, he argues, the only part of his DuPont pension which can be attached for wife-appellee's support is that which was earned prior to their separation on February 5, 1994. Moreover, he argues, because he remarried as soon as the divorce was final, that portion of the pension earned after his remarriage is properly saved for the benefit of his new wife and any children of that marriage.

¶ 8 Husband-appellant's argument fails because it is misdirected. His argument is one that is appropriate in the context of an award of equitable distribution. The order of the court in issue here does not involve the initial distribution of the assets of the marriage. Rather, it resulted from the court's finding that appellant remained in willful contempt of the orders of May 20, 1997 and December 22, 1997. The award was designed to compensate wife-appellee

---

4. The Honorable Jacqueline Cody (nee Carroll).

5. The Honorable Katherine B.L. Platt.

6. At some point, husband-appellant liquidated the SIP, of which appellee was to receive 60%, and she received no funds from the SIP.

for the losses she incurred as a result of husband's failure to comply.

¶ 9 The Divorce Code [7] grants trial courts broad powers to enforce orders of equitable distribution, and provides remedies available against one who fails to comply with a court's order of equitable distribution. These remedies include, in § 3502(e), the transfer or sale of any property required to comply with the court's order. As the hearing court explained in its opinion supporting the order under appeal, the non-marital part of husband-appellant's pension that was allocated to wife-appellee was not in equitable distribution, but rather property awarded under the court's equitable powers to effectuate the support award that appellant has evaded paying. The purpose of the proscription, in ERISA, on alienation and assignment of pension funds is to protect the participant from his or her own financial improvidence. It is not intended to alter support obligations. *Stinner v. Stinner*, 520 Pa. 374, 554 A.2d 45 (1989).

### Failure to agree to a stipulation

■ ¶ 10 Husband-appellant takes the position that a court has no authority to hold a litigant in contempt because he fails to agree on some business before the court. The court therefore cannot hold him in contempt for failing to sign the QDRO pertaining to his pension. We accept the rationale of the hearing court that the only asset remaining to satisfy husband-appellant's financial obligations to wife-appellee is the pension, and that distribution of pension benefits would not ordinarily accrue until husband's retirement age is reached in 2014. The signing of the QDRO was therefore a necessary mechanism to insure that wife-appellee would receive arrearages due.

### Medical insurance

■ ¶ 11 Husband-appellant challenges the court's calculation that his indebtedness includes the payment of medical bills incurred by his former wife, which amount to $15,681.23. The court's order of May, 1997 required him to pay the cost of medical insurance for her, comparable to current COBRA coverage, for three years from the date alimony commences. That obligation ran from May 1997 to May 2000. At some time in 1997, the COBRA coverage lapsed for non-payment of premiums. Wife-appellee testified that the COBRA coverage originated with appellant's employment at DuPont, that when he stopped making payments and the coverage lapsed, she was unable to resume the coverage by making her own payments, that she was unable to obtain other private medical insurance on her own, and as a result of her medical expenses and the cost of prescription drugs, she has had to declare bankruptcy. N.T., 8/9/1999, at 23, 33; 5/17/2000, at 28.[8] We reject husband-appellant's argument that his obligation was only for medical insurance, and not for medical costs incurred as a result of his permitting her coverage to lapse. His obligation to pay for medical insurance was to prevent wife-appellee from incurring uninsured medical expenses. His failure to fulfill his legal obligations in this instance are the cause of the indebtedness for medical bills, and are properly included in the calculation of what he owes.

### Alimony

■ ¶ 12 Husband-appellant asserts that he should not be held in contempt for

---

7. 23 Pa.C.S.A. § 3502.

8. The master's report of 1996 indicated that appellee had ongoing medical problems resulting from an automobile accident; that she had physical limitations and could not sit without a brace.

failure to pay alimony because he "lost" the job on which alimony was predicated in 1997. He further asserts that the court should not hold him in contempt for failure to pay alimony before his petition to terminate or modify alimony, filed on March 6, 2000, was heard. Husband-appellant never appeared in court to testify about his termination of employment at DuPont. When he filed his petition, the amounts for alimony and medical insurance were more than two years overdue. Although he claims that he had no notice of the contempt proceedings, he was represented by counsel at the hearings. We find no merit in this issue.

## Future value of a debt

¶ 13 Husband-appellant challenges the court's calculation of his pension indebtedness, because the court imputed an amount owed in 2014, appellant's earliest retirement year. The court accepted wife-appellee's worksheet, entered as exhibit P 3, that stated the amounts owed for alimony plus interest to date, the SIP award plus interest, medical expenses plus interest, and counsel fees. To this sum was added legal interest to November 2014, the earliest date that appellant could begin to receive retirement benefits. N.T., 5/17/2000, at 20–29. The amount does not include any future award of alimony, merely interest on the amount currently due, calculated to the date she will receive it. The court stated, "I will be double-checking the math myself just because that is the kind of person I am." N.T., 5/17/2000, at 46. As the court explained, "Appellant's counsel had an opportunity to cross-examine on the contents of the calculations, and to argue to the court as to its legal value and relevance." Opinion, p. 1269. The court, having reviewed the calculations in the exhibit and finding that they were credible and supported by the record, issued its order. Our review leads to the conclusion that the court acted correctly, and we therefore affirm the order.

¶ 14 Order affirmed.